[Crim. No. 7381.   Second Dist., Div. One.   May 12, 1961.]

THE PEOPLE, Respondent, v. JULIUS H. RODRIGUEZ, Appellant.

Julius H. Rodriguez, in pro. per., for Appellant.

Stanley Mosk, Attorney General, and S. Clark Moore, Deputy Attorney General, for Respondent.

WOOD, P. J.—Defendant was accused of unlawfully possessing heroin. The information also alleged that he had been convicted previously of six felonies. In a nonjury trial he was convicted of the charge herein; and the allegations of prior convictions were found to be true. Probation was denied, and he was sentenced to imprisonment in the state prison. He appeals from the judgment.

Appellant contends the court erred in receiving the narcotics in evidence, for the reason there was no probable cause for arresting him or for searching the premises.

Officer MacMillan testified, as follows: He and Officer Dismukes had received a telephone call on February 25, 1960, from "an anonymous person" who stated that defendant was dealing in narcotics at 1118 North Cummings Street, and that defendant lived in a room at the rear of that location, which room was attached to the garage. On said date, about 11:30 p. m., the two officers went to the rear of said address and saw a light in the garage room. The officers stationed themselves outside the door of that room, and after a few minutes the door was opened, and the defendant stood in the doorway. The officers identified themselves as police officers. The officers had a short conversation with defendant pertaining to his use of narcotics, and defendant said, "I've been chippying around with the stuff, but I haven't been dealing." While defendant was standing in the doorway the light of the room made him visible, and the witness (Officer MacMillan)

observed that the pupils of defendant's eyes were pinpointed. Then he (officer) turned a flashlight toward defendant's eyes, but his eyes did not show any reaction to the light. The officer then formed an opinion that the defendant was under the influence of narcotics or had taken a fix of narcotics prior to the arrival of the officers. (It was stipulated that the officer was qualified as an expert in regard to narcotic activities.) After making such observations, the officers arrested defendant, and they questioned him as to whether he had any narcotics on the premises. He replied, "No." They asked him if he had any objection to a search being made by them, and he replied, "No." Then the officers began a search of the premises. On the dirt, just outside the door of the garage room, Officer MacMillan found a cellophane paper in which there was a capsule which contained a white powder that resembled heroin. Defendant denied any knowledge of the capsule. While searching a trash barrel which was outside, about 10 feet from the door, Officer MacMillan found 13 capsules in the bottom of the barrel—each capsule contained a "white powdery residue." When confronted with those capsules, the defendant said, "Those are mine." The officers asked defendant where his stash was. He said he lived in the rear house, and that his father, mother, nephew, and niece lived in the front house, and he (defendant) had a stash in the front bedroom of the front house. A pregnant girl was in the garage room. Before the officers went to the front house, the defendant said he did not want to embarrass the girl or the members of his family who were in the front house. Also, before the officers went to the front house, the defendant voluntarily said that he would take the officers to his stash, that none of the persons in the front house had any knowledge of his activities pertaining to narcotics, and that the stash and "outfit" were his. The officers proceeded to the rear door of the front house and knocked on the door. A young male person opened the door and admitted the officers "to the house." Then the defendant "led" them into the front bedroom, and he said that the stash was on a shelf in the closet. Officer Dismukes reached upon the shelf and removed a red balloon which contained 43 capsules of white powder, and it also contained a hypodermic outfit. Thereupon, about 1:30 a. m., they took defendant to the police station, where defendant said that he "had been dealing just enough to support his habit."

It was stipulated that a qualified chemist would testify that the 43 capsules (which were found on the shelf) and the

capsule (which was found on the ground by the door) contained heroin; and that the 13 capsules (which were found in the barrel) contained ''residue'' of heroin.

When the capsules and the hypodermic outfit were offered in evidence, defendant objected to the offer on the ''grounds of illegal search.'' At the request of defendant, the argument regarding the offer was reserved until after the defendant testified.

Defendant testified as follows: On February 25, 1960, he lived in the rear house at 1118 North Cummings Street. On said date, about 11:45 p. m., while he was in the back room of his house listening to the radio, he heard a noise of some kind (outside). He opened the door of the house, and then a man said, ''We're narcotic officers. You're under arrest.'' Then the officers handcuffed him, and asked, ''Where's the stuff?'' They said that they would not leave until they found it. When defendant asked if they had a search warrant, they said they did not need one. They asked how much he was using, and he said, ''I've been chippying around, but that's about it.'' The officer went into the room and the other one searched a tool box which was outside. Defendant told them they could search. They found one capsule on the grass about 20 feet from the door of the house. An officer looked in the trash cans, and then said he found ''these empty cans.'' Defendant said he had no knowledge of them. One of the officers said they were going to take him in on possession, and they were going to take the woman. Defendant asked them to give her a ''break,'' and said that she was pregnant. The officers said they knew he had more stuff, and they were going to search the front house and if they found the stuff there, everyone was going to jail. The officers knocked on the door of the front house. Defendant said, ''Well, wait a minute. If you're going to go through all that trouble, I'll show you where it is.'' Then he (defendant) said, ''So I just took them and I gave it to them,'' but he would not have shown them where it was if they had not threatened to take the girl, his father and mother, and the boy. When the officers put the handcuffs on him, they asked him what his name was. When defendant told the officers that they were trespassing on private property, they said they had information. Defendant asked who told them. An officer replied that they did not have to tell him, and that defendant was ''dead.'' Defendant testified further (on cross-examination) to the effect that he had been convicted of six felonies. It was stipulated that the

validity of the alleged prior convictions might be considered on the information contained in the probation report, and might be determined at the time of the probation hearing.

[██] Appellant argues that there was no probable cause for the arrest or search, because the officers were acting upon information supplied by an anonymous informer. He also argues that the officers gained entry into his room by trickery. The officers had received information by telephone from a person who did not state his name but did state that appellant was dealing in narcotics at the garage room. While the officers were stationed outside the door of that room the appellant opened the door and stood in the doorway. After identifying themselves as police officers, they had a conversation with appellant regarding appellant's use of narcotics, and in that conversation appellant said he had been ''chippying around'' with narcotics but he had not been ''dealing.'' During that time one of the officers observed that appellant's eyes were pinpointed and that they did not show any reaction to light. Thereupon, that officer, who was qualified to give an opinion regarding effects of using narcotics, formed an opinion that appellant was under the influence of narcotics or he had recently used narcotics. It thus appears that prior to the arrest, the officers not only had information that appellant was dealing in narcotics, but they heard him say that he was using the ''stuff,'' and they observed from the appearance of his eyes that he was under the influence of or had recently used narcotics. In *People* v. *Elliott,* 186 Cal.App.2d 185 [8 Cal. Rptr. 716], after officers stopped the defendant because he was riding a motorcycle that did not have a rear light, one of the officers noticed that the pupils of defendant's eyes were pinpointed. In that case the officer gave defendant a light-reaction test and found that his eyes did not react to light. It was said therein (p. 189) that the officer ''noticed the condition of the appellant's eyes, gave the test which had been mentioned hereinabove, and was informed by the appellant that he had used heroin about 40 days before. Such circumstances justified a reasonable belief that the appellant was at the time an unlawful user and addicted to the unlawful use of narcotics. Hence the arrest was lawfully made. [Citations.]'' In the present case there was probable cause for arresting appellant.

[██] The search outside and near the garage room was an incident of a lawful arrest. Furthermore, there was testimony on behalf of the People, and there was testimony by

appellant, that appellant consented to the search. As a result of that search a capsule of heroin was found on the ground near the door, and 13 capsules containing "residue" of heroin were found in a trash barrel which was about 10 feet from the door. Appellant said that the 13 capsules were his. It thus appears that, irrespective of the search of the front house, there was sufficient evidence of possession of heroin by appellant to support the judgment.

With reference to the search of the front house, appellant asserts in effect that he consented to that search by reason of coercion in that the officers had threatened to take the girl and members of his family to jail. There was testimony on behalf of the People that, before the officers went to the front house, the appellant said that he had a stash in the front house; that appellant voluntarily said he would take the officers to his stash. Appellant testified that when the officers knocked on the door of the front house he (appellant) said that he told them that he could show them where his stash was. He also testified that he took them to it and gave it to them. Whether appellant consented to a search of the front house by reason of coercion was a question of fact for the determination of the trial judge. (See *People* v. *Campos,* 184 Cal.App. 2d 489, 493 [7 Cal.Rptr. 513].)     "The extent of the consent is a question of fact for the trial court just as the voluntary nature of the consent is such a question." (*People* v. *Neal,* 181 Cal.App.2d 304, 308 [5 Cal.Rptr. 241].)     The evidence was sufficient to support a finding that appellant consented to a search of the front house and that his consent was not coerced.

The judgment is affirmed.

Fourt, J., and Lillie, J., concurred.

A petition for a rehearing was denied May 24, 1961, and appellant's petition for a hearing by the Supreme Court was denied July 5, 1961.